IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
                                :
JAMES COLES, et al.,            :       HON. JEROME B. SIMANDLE
                                :
              Plaintiffs,       :       Civil No. 10-6132 (JBS/AMD)
                                :
      v.                        :
                                :            OPINION
NICHOLAS CARLINI, et al.,       :
                                :
              Defendants.       :
                                :
```

Appearances:

Boyd Spencer, Esq.
BOYD SPENCER & ASSOCIATES
2100 Swede Road
Norristown, PA 19401
      - and -
William P. Murphy, Esq., admitted pro hac vice
Two Penn Center, Suite 200
Philadelphia, PA 19102
      Attorneys for Plaintiffs

John J. Hoffman, Acting Attorney General of New Jersey
      By: Roshan D. Shah, Deputy Attorney General
OFFICE OF THE ATTORNEY GENERAL
25 Market Street
P.O. Box 112
Trenton, NJ 08625
      Attorneys for Defendants

**SIMANDLE**, Chief Judge:

# I. Introduction

Plaintiffs James Coles, Joseph Ballinger, and Louis C. DeGailler are members of motorcycle clubs who, during a traffic stop in 2009, were ordered by a New Jersey State Trooper to remove their jackets bearing "colors," the collective membership marks or logos for the motorcycle clubs. The police told

Plaintiffs that the police colors "blue and gold" were the "only colors you wear" on the highway. Plaintiffs brought this action alleging violations of the First, Fourth and Fourteenth Amendments to the U.S. Constitution, pursuant to 42 U.S.C. § 1983, as well as analogous state-law claims.

Before the Court are cross-motions for partial summary judgment. [Docket Items 115 & 120.] Plaintiffs seek partial summary judgment only on the question of whether "the first amendment was violated by the defendant State Troopers in the course of their 'anti-colors' speech delivered during plaintiffs' custodial detention at roadside." (Pl. Mot. Br. at 1.) At this time, Plaintiffs do not move for summary judgment based on the entirety of the traffic stop, including whether the stop itself was pretextual and initiated in retaliation for Plaintiffs' alleged expressive conduct. Defendants[1] oppose the motion and request partial summary judgment in their favor, because (1) Defendants are entitled to qualified immunity, (2) no violation of the First Amendment occurred, and (3) Plaintiffs Coles and

---

[1] The Defendants named in the Second Amended Verified Complaint are State Troopers Nicholas Carlini, Gregory Manuel, Kristofer Gertsen, Erik Lindner and Thomas O'Connor, as well as "Paula T. Dow, and her successors, as the Attorney General of New Jersey," and "Colonel Joseph R. Fuentes, Ph.D. and his successors, as the Superintendent of State Police." [Docket Item 55.] Jeffrey Chiesa was substituted for Paula T. Dow, effective nunc pro tunc on January 10, 2012. [Docket Item 60.] John J. Hoffman is currently the Acting Attorney General of New Jersey. [Docket Item 162.]

Ballinger are judicially estopped from asserting claims for damages because they failed to disclose their potential claims when each was going through bankruptcy. The Court heard oral argument on July 7, 2013.

On the merits of the First Amendment issue, the key question is whether there is a genuine issue of material fact as to the injury suffered by Plaintiffs, which would preclude summary judgment. Because the Court finds that (1) a genuine dispute of fact exists relating to Plaintiffs' injury and (2) Defendants are not entitled to qualified immunity on the grounds that Defendants merely attempted to violate Plaintiffs' First Amendment rights, both motions for partial summary judgment on the First Amendment issue will be denied. On the judicial estoppel issue, the key question for the Court is whether bad faith may be inferred from Coles's and Ballinger's nondisclosure of this litigation as a contingent asset in their bankruptcy proceedings, while simultaneously pursuing the present claims for damages. Because the Court finds that bad faith may be inferred in this case, the Court will grant Defendants' motion for partial summary judgment, prohibiting Coles and Ballinger from seeking compensatory or punitive damages.

## II. Background

On July 30, 2009, Plaintiffs Coles, Ballinger and DeGailler and three others were driving their motorcycles on a highway in

Vincentown, New Jersey, wearing jackets or vests bearing
"colors," or logos indicating membership in either the Pagan's
Motorcycle Club or the Tribe Motorcycle Club.[2] (Statement of
Material Facts ("SMF") [Docket Item 115-4] ¶¶ 2-4.) New Jersey
State Troopers initiated the traffic stop at approximately 7:28
p.m. (Id. ¶ 4.) Defendant Trooper Nicholas Carlini told
Plaintiffs to stay on their motorcycles and returned to his car,
until other troopers -- Defendants Kristofer Gertsen, Erik
Linder, and Thomas O'Connor -- arrived at the scene. (Id.)

While inside his car, Trooper Carlini asked an unidentified
trooper, "Are we going to use the blue and gold are the only
colors that ride these roads?" (Pl. Ex. C at 27:8-10.) "Blue and
gold" refers to State Police uniform colors. The unidentified
trooper agreed. (Id. at 27:11.) Trooper Carlini then stated:
"We're using blue and gold are the only colors that are allowed
to ride on this road." (Id. at 28:6-8.) Later, a trooper asked,
"When we eventually go out there, what's our game plan for
turning everything inside out? Do we give them like one big
speech or we tell them one at a time?" (Id. at 40:10-14.) Trooper
Carlini answered: "Blue and gold are the only colors that ride on
this road. You guys all want to leave here, you're going to turn

<hr />

[2] The facts of this case were described in detail in Coles
v. Carlini, No. 10-6132, 2012 WL 1079446, at *1-*5 (D.N.J. Mar.
29, 2012). Because the pending motions relate to only part of the
traffic stop, the Court will focus its attention on only those
facts.

your -- you're going to take your jackets off." (Id. at 40:15-19.)

At 8:15 p.m., approximately 47 minutes into the traffic stop, the police issued tickets to all of the motorcyclists for not having authorized helmets. (Id. at 44:1-2; Def.'s Counterstatement of Material Facts ("CMF") ¶ 22.) One motorist immediately requested a complaint form. (Pl. Ex. C. at 44:3-4.) Trooper Carlini responded: "Yeah, sure. Hold on, all right." (Id. at 44:9-10.) After a brief pause, he added: "Now, you're all going to take your jackets off. On this highway, these are the only colors you wear," gesturing at his blue and gold uniform. (Pl. Ex. C at 44:12-14; SMF ¶ 10.) At this point, five Troopers were standing around the Plaintiffs, who remained on their motorcycles. (SMF at 5.)

Trooper Carlini then addressed Ballinger, informing him that he was getting an additional ticket for driving his motorcycle while his license was suspended. (Pl. Ex. C at 44:18-22.) Carlini indicated that no licensed driver was available to drive Ballinger's bike, including Ballinger's wife, Kelly, who had been riding as a passenger, concluding: "So you're going to take your jackets off and I'm going to tow this bike." (Pl. Ex. C at 44:19-24; SMF ¶ 12.) Soon thereafter, Trooper Carlini rephrased his statement: "You want to take your jackets off? If not, this bike is getting hooked." (Pl. Ex. C at 45:10-12.)

Plaintiffs did not take off their jackets or turn them inside out. One trooper repeated "Inside out," which Trooper Carlini followed with: "I can stand here all night as well." (Id. at 45:15-18.) At 8:16 p.m., Carlini informed the motorists, "I'm going to give you your complaint form, and I'm going to call for a tow for the impound." (Id. at 45:21-23.) Carlini placed the call and returned with a complaint form for Coles. (CMF ¶ 33.) At 8:19 p.m., Carlini told the motorists with valid licenses that they were free to leave. (Id.) Coles and DeGailler left the scene with their jackets on. (Id. ¶ 34.) The elapsed time from the Trooper's "colors" speech to the indication to the ticketed motorcyclists that they were free to leave was four minutes.

Before the tow truck arrived, Plaintiff Ballinger's friend arrived with a valid motorcycle license and drove the motorcycle and Mrs. Ballinger away. (SMF ¶ 15.) Plaintiff Ballinger also left, as a passenger in a friend's truck. Trooper Carlini canceled the call for a tow. (Id.)

## III. Standard of review

A court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if, based on the evidence in the record, a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

248 (1986). A fact is "material" if it might affect the outcome of the suit. Id. The court will view evidence in the light most favorable to the non-moving party and "all justifiable inferences are to be drawn in [that party's] favor." Hunt v. Cromartie, 526 U.S. 541, 552 (1999).

When ruling on cross-motions for summary judgment, the court "must consider the motions independently . . . and view the evidence on each motion in the light most favorable to the party opposing the motion." United States v. Kramer, 644 F. Supp. 2d 479, 488 (D.N.J. 2008) (citing Williams v. Philadelphia Hous. Auth., 834 F. Supp. 794, 797 (E.D. Pa. 1993), aff'd, 27 F.3d 560 (3d Cir. 1994), and Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## IV. Discussion

### A. First Amendment claim

### i. Plaintiffs' motion for partial summary judgment

Plaintiffs ask the Court to rule that "the first amendment was violated by the defendant State Troopers in the course of their 'anti-colors' speech delivered during plaintiffs' custodial detention at roadside." (Pl. Mot. Br. at 1.) Plaintiffs state that, by focusing only on the speech and related conduct by the police, the motion removes the disputed factual question of whether the stop was pretextual. (Id. at 2.) Plaintiffs contend that "sending the message that wearing colors is banned on the

roads of New Jersey and backing it up with an order to remove
those colors subject to further reprisals defines a purposeful,
direct, and chilling infringement upon free speech . . . ." (Id.
at 13.) Plaintiffs further contend that, in addition to Trooper
Carlini, the other troopers "enabled and actively supported" the
anti-colors speech by "standing guard in enforcing the extended
custodial detention." (Id.) Plaintiffs characterize the anti-
colors speech as indicative of a "ban," a "facial ban," a "facial
rule," a "prohibition" or an "off-the-books rule" against wearing
colors (Pl. Opp'n at 19, 21, 26, 29, 30, 32, 37, 39), and cite
cases in which courts struck down "statutes, rules and
regulations." (Id. at 26, 28.) Plaintiffs also advance the theory
that the police conduct constituted a "prior restraint" against
wearing motorcycle club colors. (Id. at 29.) Plaintiffs argue
that the "anti-colors rule is constitutionally offensive on its
face." (Id. at 37.)

In response, Defendants argue that Plaintiffs have failed to
state a claim under 42 U.S.C. § 1983, because Plaintiffs have not
identified an "actual deprivation" of a constitutional right.
(Def. Cross-Mot. at 27-28.) Defendants point out that the
Plaintiffs "never removed their jackets and, thus, no deprivation
of their purported right of expression ever occurred." (Id. at
28.) Defendants characterize their own conduct as "[a]t most . .
. an 'attempt' to violate constitutional rights," which is not

actionable under § 1983. (Id. at 28-29.) Defendants reject the
notion that the anti-colors statements constitute a "ban" on
expressive conduct: "It is absurd to equate Trooper Carlini's
comments with legislation or policy." (Def. Reply Br. at 15.[3]) In
the alternative, Defendants argue that genuine issues of material
fact exist, and that a jury must decide whether a person of
ordinary firmness would be deterred from exercising his
constitutional rights, within the framework of a First Amendment
retaliation claim. (Def. Cross-Mot. at 31-34.) Defendants also
argue that a jury must sort out whether Trooper Carlini
conditioned the towing of Ballinger's motorcycle on his removing
his jacket, or whether the towing was independent of the jacket.
(Id. at 34.)

At oral argument, Plaintiffs clarified that the "framework"
of this summary judgment motion does not suggest a First
Amendment retaliation claim, but that Trooper Carlini's order
itself violated the First Amendment as a ban on expressive
conduct. Plaintiffs cite Flower v. United States, 407 U.S. 197,

_____

[3] Under the Local Civil Rule 7.1(d)(3), "[n]o reply paper
shall be filed, unless permitted by the Court, relating to the
following motions: Cross under L.Civ.R. 7.1(h) . . . ."
Defendants filed a reply in support of their cross-motion for
partial summary judgment without seeking leave of this Court.
Although Defendants should have sought permission, because
Plaintiffs raised no objection to this filing and because the
Court finds the additional briefing helpful, the Court will grant
Defendants' implied request nunc pro tunc and consider
Defendants' arguments in the reply.

198 (1972), to stand for the proposition that the police cannot order a person exercising his or her First Amendment rights off of a street. Plaintiffs do not expressly state which First Amendment standard governs their claim or why a trooper's order should be analogized to a rule, regulation or statute.

The record does not contain undisputed evidence that any official ban on wearing colors exists. At best, there is circumstantial evidence. When Trooper Carlini asks, "Are we going to use the blue and gold are the only colors that ride these roads?", he arguably is referring to some existing policy about wearing colors on the highway. A custom, policy or practice arising under color of state law need not necessarily be written, see Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978) ("'Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law.'") (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 167-68 (1970)), but its existence generally may not be deduced from a one-time event. See City of Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985) ("[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell" when the municipal actor does not have policymaking authority) (Rehnquist, J., writing for a plurality); Ingram v. Twp. of Deptford, 911 F. Supp. 2d 289, 302-03 (D.N.J. 2012) (discussing cases in which one

or two instances of unconstitutional behavior did not constitute a policy or custom). In this case, such a "ban" as a matter of "custom or usage" is not compelled by the present evidence of this single incident, and it would therefore be a matter of dispute for the factfinder. Thus, Plaintiffs are not entitled to partial summary judgment.

To the extent Plaintiffs bring a First Amendment retaliation claim,[4] Defendants are correct that Plaintiffs must show, among other things, that "defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights . . . ." Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007). The Court also agrees that whether a person of ordinary firmness would be deterred from exercising his or her rights is a question for the jury. In this case, it is undisputed that Plaintiffs did not remove or turn inside out their jackets or vests, when commanded to do so by the police. A reasonable jury could find that "a person of ordinary firmness" would not be deterred from wearing motorcycle club colors based on this police conduct, as the Plaintiffs themselves apparently were not.[5]

_____

[4]  See Second Am. Compl. ¶¶ 5, 171, 201, 215, 226, 257(i), 263(d).

[5]  This Court previous stated, ruling on the Defendants' motion to dismiss: "There are no allegations that the Plaintiffs have refrained from wearing their colors or associating with one another or that their expression has been chilled as a result of

However, the fact that Plaintiffs did not remove or hide their colors is not conclusive against Plaintiffs, either. The First Amendment standard requires the Court to ask whether "a person of ordinary firmness" would be deterred by the alleged offending action, not whether the Plaintiffs themselves were deterred. See Garcia v. City of Trenton, 348 F.3d 726, 729 (8th Cir. 2003) ("The question is not whether the plaintiff herself was deterred, though how plaintiff acted might be evidence of what a reasonable person would have done.") This is a jury question, and therefore Plaintiff's motion for partial summary judgment is denied.

To the extent Plaintiffs bring some other type of First Amendment claim, factual disputes exist to defeat Plaintiffs' motion for partial summary judgment. To succeed on a § 1983 claim for violation of the First Amendment, Plaintiffs must show a direct injury as a result of Defendants' actions. See Laird v. Tatum, 408 U.S. 1, 13 (1972) (stating that "government action may be subject to constitutional challenge even though it has only an indirect effect on the exercise of First Amendment rights" but that a plaintiff still must show that "he sustained, or is immediately in danger of sustaining, a direct injury as the result of that action . . . ."); 42 U.S.C. § 1983 (stating that

---

this incident. Therefore, this portion of the Plaintiffs' First
Amendment claim will be dismissed." Coles, 2012 WL 1079446, at
*11.

12

any person, acting under the color of state law, who subjects a person "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable . . . ."); Holt Cargo Sys. v. Del. River Port Auth., 20 F. Supp. 2d 803, 830 (E.D. Pa. 1998) (stating that "there must be an actual deprivation before recovery is permitted" under § 1983). Trooper Carlini may have uttered words offensive to the First Amendment, but Plaintiffs are not entitled to redress if they cannot show an actual injury.

Because the Plaintiffs have removed from the discussion, for purposes of this motion, whether the traffic stop itself constituted an injury, Plaintiffs must point elsewhere to show a constitutional deprivation. There is no evidence presently in the record that Plaintiffs' expression was chilled by Trooper Carlini's words or that the Plaintiffs removed their jackets during the traffic stop or thereafter. There is some evidence from which a reasonable jury could find that the motorcyclists were slightly delayed -- that the traffic stop was extended -- while the police discussed their "game plan" and Trooper Carlini made his statements, and Plaintiffs contend these delays were not related to a legitimate law enforcement purpose.[6] But evidence

---

[6] At oral argument, Defendants suggested that the order to remove the jackets was a safety precaution, according to an internal investigation report. The apparent rationale of requiring removal of motorcycle club jackets was to avoid attracting fellow cyclists to stop and attempt to aid these

also shows that only four minutes elapsed between the time
Trooper Carlini first ordered Plaintiffs to remove their jackets
and when the motorists with valid licenses were told they were
free to leave. During those four minutes, Trooper Carlini called
a tow truck and retrieved a complaint form for Coles. It is
unclear from the record whether Trooper Carlini called for a tow
truck because Ballinger refused to take his jacket off or because
his license was suspended. A reasonable jury could find that
Ballinger's motorcycle was being towed because Ballinger's
license was suspended and there was no licensed driver to remove
it.

Viewing the evidence in the light most favorable to
Defendants, the non-moving parties, it is reasonably factually
disputed whether Plaintiffs suffered an injury, what the injury
was and whether Plaintiffs were delayed by the comments allegedly
offensive to the First Amendment or whether the delay, if any,
was attributable to other, legitimate police conduct. Therefore,
Plaintiffs' motion for partial summary judgment will be denied.

### ii. Defendants' motion for partial summary judgment

The same dispute about the injury suffered by Plaintiffs is
enough to defeat Defendants' motion for partial summary judgment.

---

motorists, risking trooper safety. A jury may have to evaluate
this rationale in light of the fact that the directive to remove
jackets was not given until the end of this hour-long stop at the
roadside.

A reasonable jury could find that the statements did delay the Plaintiffs and that the extension of the seizure was attributable to the conduct offensive to the First Amendment.

Defendants also raise a qualified immunity defense, based on their theory that the conduct at issue was a mere attempt to violate constitutional rights, not an actual deprivation of the First Amendment. The Court previously rejected Defendants' "attempt" theory, stating that "Plaintiffs' central argument [is] that the traffic stop was allegedly initiated and <u>prolonged</u> solely because Plaintiffs were wearing motorcycle colors." <u>Coles</u>, 2012 WL 1079446, at *10 (emphasis added). An "unlawful seizure as a result of protected speech," <u>id.</u>, is an injury, not a mere attempt. No reasonable police officer could believe that the First Amendment would permit him or her to stop and detain a motorist because of the lawful clothing the person wore to indicate affiliation with a lawful group. Therefore, Defendants present no valid argument for invoking qualified immunity in this case, and Defendants' cross-motion for partial summary judgment will be denied on the merits of the First Amendment claim.

Defendants' motion for partial summary judgment will be denied as to qualified immunity.

**B. Judicial estoppel**

**i. In general**

Judicial estoppel is a discretionary doctrine recognized by

15

the Third Circuit that prevents injury to the courts and the
justice system by dismissing claims -- regardless of their merit
-- "when such dismissal is necessary to prevent a litigant from
'playing fast and loose with the courts.'" Krystal Cadillac-
Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp. (Krystal II), 337
F.3d 314, 319 (3d Cir. 2003) (quoting Scarano v. Cent. R. Co. of
N.J., 203 F.2d 510, 513 (3d Cir. 1953)). The doctrine is applied
only "to avoid a miscarriage of justice" and only when the party
to be estopped (1) took a position during litigation that is
"irreconcilably inconsistent" with his or her present position,
(2) the party changed his or her position in "bad faith," and (3)
"no lesser sanction would adequately remedy the damage done by
the litigant's misconduct." Id. (quoting Montrose Med. Grp.
Participating Sav. Plan v. Bulger, 243 F.3d 773, 779-80 (3d Cir.
2001)). The Third Circuit and district courts have invoked the
doctrine to dismiss claims where plaintiffs who are in bankruptcy
(or were in bankruptcy) failed to disclose to creditors pending
or "potential causes of action" as contingent assets in
bankruptcy filings. Id. at 322, 325 (emphasis in original). See,
e.g., Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d
414 (3d Cir. 1988); J.H. Grp., LLC v. Royal Rolling Chairs, LLC,
No. 11-1595, 2012 WL 3185933 (D.N.J. Aug. 2, 2012), aff'd, No.
12-3476, 2013 WL 2130929 (3d Cir. May 17, 2013) (unpublished
disposition); DePasquale v. Morgan Stanley Smith Barney LLC, No.

16

10-6826, 2011 WL 3703110 (D.N.J. Aug. 23, 2011); Hardee-Guerra v. Shire Pharm., 737 F. Supp. 2d 318 (E.D. Pa. 2010); In re Okan's Foods, Inc., 217 B.R. 739 (Bankr. E.D. Pa. 1998). Judicial estoppel remains "a fact-specific, equitable doctrine, applied at the courts' discretion." In re Kane, 628 F.3d 631, 638 (3d Cir. 2010).

Defendants' argument is that because Plaintiffs Coles and Ballinger failed to disclose the present litigation against the State Troopers as a contingent asset in their voluntary petitions for bankruptcy, Plaintiffs have taken (1) irreconcilably inconsistent positions in litigation, (2) they did so in bad faith to play fast and loose with the courts and to conceal potential assets from their creditors, and (3) no other remedy other than dismissal is available to avoid a miscarriage of justice. (Def. Cross-Mot. at 15-26.)

Defendants concede that judicial estoppel only applies to bar damages claims by Plaintiffs Coles and Ballinger. Because Plaintiff DeGailler never went through bankruptcy, Defendants do not ask the Court to invoke judicial estoppel against him. (Def. Reply at 3.) Therefore, DeGailler's claims for compensatory, nominal and punitive damages remain. Additionally, "the State Defendants will concede that Coles and Ballinger's injunctive relief claims should remain," even if judicial estoppel is found to apply to the damages claims. (Id.)

17

### ii. Plaintiffs' bankruptcy proceedings

### a. Plaintiff Ballinger

Plaintiff Ballinger filed for bankruptcy under Chapter 13 on May 15, 2010 -- more than 10 months after the traffic stop but still months before filing the original Complaint in this case. (Def. Counterstatement of Material Facts ("CMF") [Docket Item 120-2] ¶ 47; Def. Ex. H.)

"Schedule B" of the petition for bankruptcy requires debtors to indicate all personal property and all legal and property interests. Line item 21 on Schedule B asks debtors to disclose "Other contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims." (Def. Ex. I.) By placing an "X" next to this line item, Coles indicated that he had no contingent or unliquidated claims. (Id.)

On August 12, 2010, the U.S. Bankruptcy Court in the District of New Jersey confirmed Ballinger's Chapter 13 plan. (CMF ¶ 60; Def. Ex. H.) Less than four months later, on November 23, 2010, Ballinger and his co-Plaintiffs filed the original Complaint in this case. When Ballinger defaulted on his Chapter 13 plan, the Chapter 13 Trustee moved to dismiss the case. On March 25, 2011, the court dismissed the bankruptcy case. (CMF ¶ 64; Def. Ex. H.)

### b. Plaintiff Coles

18

Plaintiff Coles filed a Chapter 13 voluntary petition for bankruptcy on March 2, 2007, more than two years before the traffic stop. (CMF ¶ 69.) He also filed a proposed Chapter 13 plan. (Id. ¶ 71.) The U.S. Bankruptcy Court in the District of New Jersey confirmed Coles's plan on June 27, 2007. (Id. ¶ 72; Def. Ex. J.) On May 14, 2009 -- still months before the traffic stop -- the court entered an order modifying the Chapter 13 plan. (CMF ¶ 73.)

More than a year later, and just a few days after the original Complaint was filed in this case, Coles filed a Certification in Support of Discharge in his bankruptcy case. (Id. ¶ 74; Def. Ex. L [Docket Item 120-9].) On the form, he certified (1) his name, address and employer, (2) that he was not required to pay any domestic support obligations, (3) that he completed a Financial Management Instructional Course and filed a corresponding form, and (4) that he was not subject to a restriction on exemptions or discharge pursuant to 11 U.S.C. § 522(q). (Def. Ex. L.) More than three months after Coles's complaint herein was filed, on February 23, 2011, the Chapter 13 Standing Trustee filed a Final Report & Account recommending that $102,661.35 in unsecured claims be discharged without payment. (Def. Ex. M.) On March 2, 2011, the bankruptcy court granted Coles a discharge under § 1328(a) of Title XI of the U.S. Bankruptcy Code. (CSF ¶ 76.)

### iii. **Waiver**

Plaintiffs argue that the affirmative defense of judicial estoppel was waived by Defendants, because it was not included in Defendants' Answer. (Pl. Reply at 5.) In fact, Defendants included estoppel in their Thirty-First Affirmative Defense: "Plaintiff's claims are barred by the doctrines of waiver, estoppel, laches, unclean hands and/or acquiescence." (Answer at 31.) A more specific articulation of the defense is not necessary, because the pleading requirements of Iqbal and Twombly do not apply to affirmative defenses. FTC v. Hope Now Modifications, LLC, No. 09-1204, 2011 WL 883202, at *3-*4 (D.N.J. Mar. 10, 2011) ("the pleading standards of Twombly and Iqbal do not apply to affirmative defenses under Rule 8(c)"). Plaintiffs could have served discovery requests to investigate the basis for the affirmative defenses but did not. (Id.) The defense has not been waived.

### iii. **Duty to disclose**

Debtors have a duty to disclose potential causes of action that are known to the debtor prior to the resolution of the bankruptcy proceedings. The Third Circuit has stated that "a debtor must disclose any litigation likely to arise in a non-bankruptcy conte[x]t," Oneida, 848 F.2d at 417, and courts have enforced that rule when debtors' disclosure statements were filed after the potential cause of action occurred and was known to the

20

debtor. See In re Okan's Foods, 217 B.R. at 747, 753-55 (applying
judicial estoppel when the debtor's disclosure statement omitted
a cause of action that had been known to the debtor for more than
six months, even though he did not file a complaint based on that
cause of action until four months after the bankruptcy plan was
confirmed).

Plaintiff Ballinger had a duty to disclose the potential
litigation to the bankruptcy court. Ballinger had known of his
potential cause of action for more than 10 months prior to filing
his disclosure and more than a year before the bankruptcy court
confirmed his bankruptcy plan.

Plaintiffs argue that Ballinger did not intend to join the
present lawsuit until October 2010, months after he defaulted and
"considered the bankruptcy to be over." (Pl. Reply at 9-10;
Ballinger Aff. [Docket Item 140] ¶ 9.) Therefore, Plaintiffs
argue that he was under no duty to disclose the potential claim.
Defendants persuasively counter that the bankruptcy code
"requires that a debtor list potential causes of action, not
claims it actually intends to sue on at the time of the required
disclosure." Krystal II, 337 F.3d at 322. Ballinger had a duty to
disclose the potential litigation on his disclosure form.

Although Plaintiff Coles's bankruptcy plan was confirmed
prior to the incident giving rise to the cause of action omitted
on his forms, debtors have an ongoing, affirmative duty to

disclose contingent assets to the bankruptcy court. See 11 U.S.C.
§ 1306(a)(1) ("Property of the estate includes . . . all property
of the kind specified" in section 541 "that the debtor acquire[d]
after the commencement of the case but before the case is closed,
dismissed or converted"); DePasquale, 2011 WL 3703110, at *3 ("If
the debtor is unaware of contingent claims at the time when she
discloses her assets, the debtor has an obligation to amend the
bankruptcy schedule and disclose claims once aware of them.")
(citing Donato v. Metro. Life Ins. Co., 230 B.R. 418, 421 (N.D.
Cal. 1999)); Bosco v. C.F.G. Health Sys., LLC, No. 04-3517, 2007
WL 1791254, at *3 (D.N.J. June 19, 2007) ("The duty to disclose
is an obligation that continues throughout the course of a
Chapter 13 proceeding.").[7] Coles, too, had a duty to disclose
assets while his bankruptcy was pending.

Plaintiffs argue that Coles's duty to disclose ceased under
11 U.S.C. § 1327(b) after confirmation of his plan because Coles
opted for the property of his estate to revest in the debtor upon
confirmation. (Pl. Reply at 8-9.) Defendants counter that the
cited provision "merely confirms the debtor's ability to utilize
property of the estate, notwithstanding that designation, in

---

[7]   The Court in Bosco denied a motion for reconsideration
because evidence of the debtor-plaintiff's failure to disclose a
claim in bankruptcy did not qualify as newly discovered evidence
and permitting the previous ruling to stand would not result in a
manifest injustice, and declined to apply judicial estoppel. Id.
at *3-*4.

satisfaction of the debtor's obligations under the confirmed plan." (Def. Reply at 7, quoting In re Tarby, No. 11-32886, 2012 WL 1390201, at *4 (Bankr. D.N.J. Apr. 20, 2012). Property acquired after confirmation still can be property of the estate.

### v. Element 1: Irreconcilably inconsistent

The first prong of the analysis is whether Plaintiffs have "taken two positions that are irreconcilably different . . . ." Krystal II, 337 F.3d at 319. The Third Circuit has "expressly left open [whether] ... nondisclosure, standing alone, can support a finding [of irreconcilable inconsistency] ... within the meaning of the judicial-estoppel doctrine." In re Kane, 628 F.3d at 639 (alterations in original); see also Freedom Med. Inc. v. Gillespie, No. 06-3195, 2013 WL 2292023, at *23 (E.D. Pa. May 23, 2013) (quoting In re Kane, and analyzing Krystal II and Oneida, concluding that both of those cases "involved not just a failure to disclose potential causes of actions, but misleading asset disclosures"); Clark v. Strober-Haddonfield Grp. Inc., No. 07-910, 2008 WL 2945972, at *2 (D.N.J. July 29, 2008) (acknowledging the lack of Third Circuit precedent but stating that "judicial estoppel frequently arises in the context of a failure to list a claim as an asset in a bankruptcy, and the inconsistent pursuit of an undisclosed claim").

Here, the record reveals more than mere nondisclosure. Both Coles and Ballinger have recently provided affidavits stating

that they believed their claims were without monetary value and they did not consider the case to be an asset. (Ballinger Aff [Docket Item 140] ¶¶ 2, 4, 6, 13 ("I did not believe that a civil rights action would have any money value"); Coles Aff. [Docket Item 139] ¶¶ 6, 10, 21 ("I did not add the traffic stop to my list of assets because I was not involved as a plaintiff and did not think it was an asset.").) At the same time, while their bankruptcy proceedings were still open, both Coles and Ballinger signed verified complaints demanding compensatory damages for "pain, suffering, emotional distress, embarrassment, humiliation, false imprisonment, malicious prosecution, abuse of process, misuse of process, endangerment, injury to their reputation," nominal damages, and punitive damages, plus attorneys' fees. (Compl. [Docket Item 1] ¶ 232; see also Second Verified Am. Compl. [Docket Item 55] ¶ 235.) The civil cover sheet lists the money damages demand as $150,000. (Compl.; Second Verified Am. Compl.) These representations to the Court are irreconcilably inconsistent.[8]

### vi. Element 2: Bad faith

For judicial estoppel to apply, Plaintiffs' inconsistent positions must be a product of bad faith. A "rebuttable inference of bad faith arises when averments in the pleadings demonstrate

---

[8] At oral argument, Plaintiffs' counsel admitted that Plaintiffs submitted inconsistent pleadings and should not have done so.

both knowledge of a claim and a motive to conceal that claim in the face of an affirmative duty to disclose." Krystal II, 337 F.3d at 321; see also Van Blunk v. McAllister Towing of Philadelphia, Inc., No. 10-686, 2012 WL 832997, at *2 (D.N.J. Mar. 12, 2012) (citing In re Chambers Dev. Co., Inc., 148 F.3d 214, 229 (3d Cir. 1998)). Whether the party to be estopped actually benefitted from its inconsistent position is "merely a factor in determining whether the evidence would support a conclusion of bad faith." Krystal II, 337 F.3d at 324. If, however, "'the prior position was taken because of a good faith mistake rather than as part of a scheme to mislead the court,' then the doctrine of judicial estoppel should not be applied." DePasquale, 2011 WL 3703110, at *5 (quoting Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 362 (3d Cir. 1996)). In Ryan, the Third Circuit stated that "policy considerations militate against adopting a rule that the requisite intent for judicial estoppel can be inferred from the mere fact of nondisclosure in a bankruptcy proceeding. . . . [W]e are unwilling to treat careless or inadvertent nondisclosures as equivalent to deliberate manipulation when administering the 'strong medicine' of judicial estoppel." Ryan, 81 F.3d at 364.

Defendants argue that Ballinger and Coles were aware of all the facts giving rise to their claim at the very latest on November 23, 2010 (when the complaint was filed), but as early as

July 30, 2009, the date of the traffic stop. (Def. Opp'n at 23.) Defendants contend both Plaintiffs also had a motive to conceal their claims from the bankruptcy court and creditors, because any asset would be available to creditors. (Id. at 24-25.) Defendants thus conclude that these facts create a rebuttable inference of bad faith. (Id. at 25.)

Plaintiffs counter with affidavits from the Plaintiffs averring that they expected only nominal money damages and filed the lawsuit primarily to obtain declaratory or injunctive relief. (Pl. Reply. at 14; Pl. Ex. I & K.) Coles states: "Mr. Spencer [his attorney] carefully explained to us that a civil rights action had little monetary value, and that we should proceed with no expectation of a financial return . . . ." (Coles Aff. ¶ 6.) He swears that "I did not consider the case to be an asset." (Id. ¶ 21.) Similarly, Ballinger states he did not believe the case had "money value," and he did not "add the traffic stop to my list of assets because I was not involved as a plaintiff and did not think it was an asset." (Ballinger Aff. ¶¶ 4, 6.) He claims he assumed his bankruptcy was over in August 2010, when he was unable to make his payments and before he joined the case as a Plaintiff. (Id. ¶ 9-10.)

It is undisputed that while Coles and Ballinger had bankruptcy petitions pending, they had knowledge of their claims and, in fact, signed and filed a verified complaint seeking

substantial money damages for both compensatory and punitive relief. In addition, Coles and Ballinger had a motive to conceal the contingent assets, disclosure of which would have been material to creditors who need to analyze all of the potential assets and who, potentially, could have litigated on behalf of Plaintiffs, had Coles and Ballinger decided not to pursue the claim. Without disclosure that these plaintiffs, as debtors, were simultaneously pursuing claims for compensatory and punitive damages, their creditors could not make an informed choice of how to pursue their interests. Therefore, a presumption of bad faith arises in this case.

Plaintiffs' affidavits do not adequately rebut the presumption of bad faith. Taken as true, the affidavits do not suggest the kind of "careless or inadvertent nondisclosures" the Ryan court described as excusable. Instead, the affidavits state that Coles and Ballinger considered the claims but did not disclose them because they made the initial calculation that the claims had little or no money value or were too insignificant to warrant disclosure. These determinations cannot excuse nondisclosure. See Jones v. United States, 467 F. App'x 815, 818 (11th Cir. 2012) (rejecting an appellant's arguments that nondisclosure of a pending Federal Tort Claims Act action, which demanded $10 million in damages, was excusable because plaintiff believed the claim was too speculative and "had no value"); In re

Okan's Foods, 217 B.R. at 753-54 (invoking estoppel when a plaintiff had misleadingly downplayed the potential value of a pending § 1983 action in bankruptcy proceedings); In re Tennyson, 313 B.R. 402, 406 (Bankr. W.D. Ky. 2004) ("Debtors may not selectively list assets solely on the basis of their perceived value."); In re Koch, 229 B.R. 78, 87 (Bankr. E.D.N.Y. 1999) (invoking estoppel when a plaintiff failed to notify the former trustee of the existence of property that later formed the basis for a lawsuit seeking damages that would have paid creditors 100 percent of the amounts due them).

Even accepting that Coles and Ballinger did not disclose the litigation initially because they believed their claims had no monetary value, Coles and Ballinger later affixed their signatures to the verified complaint demanding $150,000, plus punitive damages. At that time, they still had an affirmative obligation to disclose contingent assets to the bankruptcy court. Plaintiffs' own justifications for nondisclosure simply do not excuse the continued nondisclosure after Plaintiffs swore to this Court, via the verified complaint, that the claims were of significant value. Coles and Ballinger do not suggest that nondisclosure was inadvertent or a result of carelessness. They do not suggest that they were unaware of the duty to amend their disclosures to the bankruptcy court. Instead, they swear that they believed the claims were of little value and at the same

28

time also swear in the verified complaint herein that the claims are significantly valuable. At the very least, once Plaintiffs represented to this Court in November 2010 that the claims were potentially valuable, they should have amended their disclosures to the bankruptcy court, rather than potentially benefit from their continued nondisclosure. Plaintiffs' actions and affidavits reveal an attempt to have it both ways in two different courts in this District and suggest bad faith, rather than rebut its presumption. If no lesser sanction is available, the Court will invoke judicial estoppel in this case.

### vii. Element 3: No lesser sanction is available

Courts in this Circuit have rejected the notion that the harm of nondisclosure is adequately cured by directing any damages awarded to the Plaintiff to creditors. Courts point out that while some creditors might benefit from the arrangement, that approach permits Plaintiffs to "wait and see" if their nondisclosure is noticed and "essentially amounts to no sanctions whatsoever." DePasquale, 2011 WL 3703110, at *7. "[N]ondisclosure must be measured in more than monetary terms" because "nondisclosures affect creditors' willingness to negotiate their claims and enhance the debtor's bargaining position by making the pot that creditors look to for recovery appear smaller than it really is." Krystal II, 337 F.3d at 325.

Because disclosure potentially would have made a difference

to Coles's and Ballinger's creditors, and to prevent Plaintiffs from making inconsistent material representations to the courts of this District, no lesser sanction than judicial estoppel is appropriate in this matter. The Court therefore holds that Plaintiffs Coles and Ballinger are estopped from pursuing (1) compensatory damages in excess of nominal damages and (2) punitive damages in this case. Coles and Ballinger still may seek nominal damages, because disclosure of a claim seeking nominal damages would not have been material to the bankruptcy proceedings. The Court notes, again, that Plaintiff DeGailler still may seek all damages demanded in the Second Verified Amended Complaint, including compensatory and punitive damages, and all Plaintiffs may seek declaratory and injunctive relief, which likewise would have been immaterial to the bankruptcy proceedings.

Judicial estoppel is a discretionary doctrine, but its application is appropriate here to limit Plaintiffs to recovering only those damages consistent with their representations to the bankruptcy court and to this Court in their affidavits: that their potential claims were of no more than nominal monetary value. This result does not disrupt Plaintiff Coles's sworn purpose for bringing this litigation: "I became a plaintiff in the case against the New Jersey State Police for the purpose of preserving the rights of myself and my brothers to ride free from

30

harassment by the police." (Coles Aff. ¶ 20.) Likewise, Plaintiff Ballinger joined the litigation "to keep the New Jersey State Police from further harassment of myself and my brother club members." (Ballinger Aff. ¶ 11.) Coles and Ballinger may yet vindicate their rights, as they set out to do. But they may not recover more than what they swore they believed their claims were worth or more than they indicated their claims were worth to the bankruptcy court.

## IV. CONCLUSION

The cross-motions for partial summary judgment are denied on the First Amendment claim, because the evidence adduced could permit a reasonable jury to find in either parties' favor and because the record contains material factual disputes. Defendants' motion for partial summary judgment will be granted as to Defendants' judicial estoppel defense. Plaintiffs Coles and Ballinger may seek nominal damages and declaratory and injunctive relief, but may not seek other compensatory or punitive damages. An accompanying Order will be entered.


July 22, 2013                          s/ Jerome B. Simandle
Date                                   JEROME B. SIMANDLE
                                       Chief U.S. District Judge


31