IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

JAMES COLES, et al.

                    Plaintiffs,

        v.

NICHOLAS CARLINI, et al.

                    Defendants.

HONORABLE JEROME B. SIMANDLE

Civil No. 10-6132 (JBS/AMD)

**OPINION**

APPEARANCES:

Boyd Spencer, Esq.
BOYD SPENCER & ASSOCIATES
2100 Swede Road
Norristown, PA 19401

        and

William P. Murphy, Esq.
Two Penn Center, Ste. 200
Philadelphia, PA 19102
        Attorneys for Plaintiff Louis DeGailler

John J. Hoffman, Acting Attorney General of New Jersey
        By: Joseph M. Micheletti, Deputy Attorney General
OFFICE OF THE NEW JERSEY ATTORNEY GENERAL
P.O. Box 112
Trenton, NJ 08625
        Attorneys for Defendants

**SIMANDLE**, Chief Judge:

I.    **INTRODUCTION**

In 2009, New Jersey State Troopers stopped a group of six

motorcyclists who were riding on Route 70 in Vincentown, New

Jersey, wearing jackets bearing "colors," the marks or logos for

motorcycle clubs to which they belonged. At the end of the
ensuing 52-minute traffic stop, the motorcyclists were ordered
to remove their jackets and were told that the police colors
"blue and gold" were the "only colors you wear" on the highway.
Three of the motorcyclists brought this suit under 42 U.S.C. §
1983, alleging violations of their First, Fourth, and Fourteenth
Amendment rights under the U.S. Constitution, as well as various
state law claims.[1] Only Plaintiff Louis DeGailler remains in this
case.

Defendants now move for summary judgment in full [Docket
Item 213], arguing that DeGailler's claims must be dismissed
because Defendants are entitled to qualified immunity, no
constitutional violations occurred, and DeGailler has no
standing to seek injunctive relief. In particular with respect
to the § 1983 claims, they argue that there was no Fourth

---

[1] The parties stipulated to the dismissal of James Coles and
Joseph Ballinger [Docket Items 182 & 200] after the Court denied
cross-motions for partial summary judgment [Docket Item 166],
and Louis DeGailler is now the only remaining plaintiff in the
case. The Defendants named in the Second Amended Verified
Complaint are the five State Troopers involved in the stop,
Nicholas Carlini, Gregory Manuel, Kristofer Gertsen, Erik
Lindner, and Thomas O'Connor; Colonel Joseph Fuentes, the
Superintendent of State Police; and "Paula T. Dow, and her
successors, as the Attorney General of New Jersey." (Second
Amended Verified Complaint ("SAC") [Docket Item 55].) Jeffrey
Chiesa was substituted for Paula Dow, effective nunc pro tunc on
January 10, 2012. [Docket Item 60.] John Hoffman is currently
the Acting Attorney General of New Jersey. [Docket Item 249.]

Amendment violation because Defendants had reasonable suspicion
that the motorcyclists were wearing illegal helmets; no First
Amendment violation because the wearing of motorcycle "colors"
is not protected by the First Amendment, and Plaintiffs were not
actually deterred from exercising their First Amendment rights;
and no equal protection violation because no fundamental rights
were violated. They also argue that Colonel Joseph Fuentes
should be dismissed from the case because there is no evidence
that the New Jersey State Troopers had a custom or policy of
unconstitutional stops of which he should have been aware.
Finally, Plaintiffs seek to dismiss Plaintiff's state law claims
on the basis that Plaintiff failed to satisfy the notice
requirements of the New Jersey Tort Claims Act. N.J.S.A. 59:8-8.

The Court heard oral argument on August 27, 2015, and
received supplemental briefing thereafter. For the reasons set
forth below, the Court will grant Defendants' motion for summary
judgment.

## II.  BACKGROUND

On July 30, 2009, Plaintiff Louis DeGailler and five other
individuals were riding in motorcycles on a highway in
Vincentown, New Jersey. Defendants State Troopers Nicholas
Carlini and Gregory Manuel saw the motorcyclists pass by and
initiated a traffic stop. Carlini testified that he observed the

motorcyclists wearing illegal helmets. (Statement of Material
Facts ("SMF") [Docket Item 213-2] ¶ 65; Carlini Dep., Def. Ex. O
[Docket Item 214-5] 54:9-25.) The traffic stop began at 7:27
p.m. and lasted for approximately 52 minutes. (SMF ¶ 75.) Much
of the vehicle stop and dialogue is on a traffic stop video in a
State Trooper's vehicle (Def. Ex. U), transcribed into the
Traffic Video Transcript (Pl. Ex. H).

After initiating the stop, Carlini told the motorcyclists
to stay on their motorcycles and asked for their license and
registration numbers. (SMF ¶ 76.) After asking several
motorcyclists where they were coming from and where they were
meeting up, he told the motorcyclists, "None of you have proper
helmets. You don't have windshields either. Supposed to have a
windshield on your bike." State regulations require drivers who
do not have wind shields on their motorcycles to wear goggles or
a helmet with a face shield. See N.J.S.A. 39:3-76.8. Carlini
then said to one motorcyclist, "[O]h, you got a windshield.
Supposed to have a windshield as well. As well as a proper
helmet." (SMF ¶ 84-85; Traffic Video 19:33:15; Traffic Video
Transcript [Docket Item 224-9] 5:10-23.)

Carlini and Manuel then returned to their car, where
Carlini told Manuel that Manuel was "going to end up writing a
bunch of tickets." He told Manuel to write the tickets "nice and

4

quick," and to pick up the pace. (SMF ¶¶ 119-120; Traffic Video Tr. 11:3-5.) Carlini radioed dispatch to run each person's license and registration number and perform a warrant check and ATS and ACS check. (SMF ¶ 108.) Defendants Kristofer Gertsen, Erik Linder, and Thomas O'Connor are members of the State Police who arrived on the scene a little later. (Id. ¶¶ 98, 99, 122.)

The six motorcyclists were wearing jackets or vests adorned with "colors," the marks or logos of the Pagan's Motorcycle Club or Tribe Motorcycle Club. (Counter Statement of Material Facts ("Counter SMF") [Docket Item 224-4] ¶ 4). O'Connor informed Carlini that there were approximately 90 motorcycles at a bar up the road and that "[t]hey're having a benefit for somebody's kid, man." (Id. ¶¶ 116-17, 126; Traffic Video Tr. 24:9-10.) According to DeGailler, the group was on their way to a charity event at a bar in Vincentown, New Jersey, to raise money for a sick child. (DeGailler Aff., Pl. Ex. J [Docket Item 224-11] ¶ 18.) DeGailler further asserts that "[I]t is the policy and custom of the Pagans Motorcycle Club to sponsor, attend and support charitable events." He further asserts that Pagan's has supported the Philadelphia Toy Run held every year for the last 30 years, the Children's Hospital of Philadelphia, and the Marine Corps Toys for Tots." (Id. ¶ 19.) At approximately 7:58, about 31 minutes into the traffic stop, Carlini said to an

5

unidentified trooper, "All right. Are we going to use the blue and gold are the only colors that ride these roads?" The unidentified officer agreed. (Traffic Video 19:58:41; Traffic Video Tr. 27:8-10.) Blue and gold refers to State Police uniform colors. One minute later, Carlini reiterated, "We're using blue and gold are the only colors that are allowed to ride on this road." (Traffic Video 19:59:12; Traffic Video Tr. 28:6-8.)

At around 8:01 p.m., after discovering that there was a restraining order against one of the motorcyclists, Joseph Ballinger, Carlini walked back to the motorcyclists to obtain identification for Ballinger's wife, Kelly, who was riding as Ballinger's passenger. He told the group that it would be "a couple minutes." He asked again, "No one wants to tell me where they're going tonight?" The motorcyclists did not respond. (SMF ¶¶ 140-42; 146-48; Traffic Video 20:01:01.)

Back in the car, Carlini was informed by dispatch that Ballinger's license was suspended. Carlini said that Ballinger was not going anywhere unless his passenger has a motorcycle endorsement. Dispatch informed him that the passenger did not have a motorcycle endorsement, and Carlini instructed Manuel to write an additional ticket for Ballinger. (SMF ¶¶ 152, 154-57.)

Further conversation ensued among the troopers. An unidentified trooper asked Carlini, "When we eventually go out

there, what's our game plan for turning everything inside out?"
Carlini responded, "Blue and gold are the only colors that ride
on this road. You guys all want to leave here, you're going to
turn your – you're going to take your jackets off." (Traffic
Video 20:10:35; Traffic Video Tr. 40:15-19.) Carlini agreed to
take the lead.

At approximately 8:15, or about 48 minutes into the stop,
the five defendant troopers approached the motorcyclists and
told them that they were all receiving tickets for not having an
authorized helmet. One motorcyclist requested a complaint form,
to which Carlini responded, "Yeah, sure. Hold on, all right."
(SMF ¶¶ 165-66; Traffic Video 20:15:35; Traffic Video Tr. 44:1-
10.) Carlini then said to the group, "Now, you're all going to
take your jackets off. On this highway, these are the only
colors you wear." (SMF ¶ 167; Traffic Video 20:15:51; Traffic
Video Tr. 44:12-14.) Neither DeGailler nor any other of the
motorcyclists removed their jacket. DeGailler drove off without
further delay.

At deposition, when asked whether motorcycle clubs have a
right to wear their colors on New Jersey highways, Carlini
responded that he thought "there's a constitutional right to
wear whatever you want." (Carlini Dep. 133:13-134:11.) Carlini
testified that his command was related to law enforcement

safety:

> We knew there were many more motorcycles in the area. We knew we were dealing with a criminal outlaw gang. We knew that – and every trooper could tell you this that in the 1980s a Trooper Jacobs was shot in the face by a Pagan. When you encompass everything in the – what we know at the time, for our safety we wanted those jackets removed.

(SMF ¶ 170; Carlini Dep.108:23–109:7.) Carlini also wanted the jackets off to prevent violence between motorcycle gangs, because he knew "there were multiple gang affiliations in the area." (Carlini Dep. 109:17-20.) Carlini testified that motorcyclists wearing "colors" indicated that they were on "official business," which meant that they were "up to some kind of criminal activity." (Carlini Dep. 110:8-16.)[2]

Carlini told Ballinger that he was receiving a ticket for driving while suspended and said, "I got no one else for this bike. So you're going to take your jackets off and I'm going to tow this bike." (SMF ¶¶ 168-69; Traffic Video Tr. 44:18-24.) He stated again, "You want to take your jackets off? If not, this

---

[2] O'Connor similarly testified:
> Through our training and experience, once any outlaw motorcycle gang is showing their colors, that means they are strictly on business for that organization . . . . What that means is they are up to some type of criminal activity. . . . So yes, the majority of outlaw motorcycle gangs, if not all, deal in criminal activity. So when they are wearing their colors, that means it's business, go time for the chapter. It's not I have my colors out, I'm going to visit my grandmother.

(SMF ¶ 136; O'Connor Dep. [Docket Item 214-4] 37:10-15.)

bike's getting hooked." (Traffic Video 20:16:22; Traffic Video Tr. 45:10-12.) The motorcyclists made no move. Another trooper repeated "inside out." Several seconds later, Carlini said, "I can stand here all night as well." Ballinger's passenger then asked, "I can't get somebody to pick up the bike?" Carlini responded, "Nope." (Traffic Video 20:16:42; Traffic Video Tr. 45:17-46:2.)

Carlini went back to his car to call for a tow truck and to retrieve a complaint form. At approximately 8:18, one of the troopers still standing by the motorcyclists said that the motorcyclists were "free to go." (SMF ¶ 196; Traffic Video 20:18:46.) Carlini returned to give Coles his complaint form, telling Coles that he was free to go. (SMF ¶ 198; Traffic Video 20:19:00.) Less than 30 seconds later, Carlini said to the group, "You five are free to leave." (SMF ¶ 200; Traffic Video 20:19:15.) DeGailler left with the other motorcyclists.[3]

DeGailler, along with the other motorcyclists, were issued tickets for illegal helmets. Two of the motorcyclists, Robert Fleming and Robert Fountain, later pled guilty to having an improper helmet at the time of the stop. (SMF ¶¶ 88-85.)

_____

[3] Ballinger and his wife stayed behind. Approximately 20 minutes later, Ballinger's friend arrived with a valid motorcycle license and drove the motorcycle and Mrs. Ballinger away. Carlini cancelled the tow truck. Ballinger left as a passenger in a friend's truck. (Counter SMF ¶ 19.)

The parties dispute whether DeGailler's helmet violated state regulations. At deposition, DeGailler admitted that his motorcycle did not have a windscreen, and his helmet did not have a face shield. (SMF ¶¶ 211-12; DeGailler Dep., Def. Ex. T [Docket Item 214-10] 58:7-8.) He stated that he did not have anything else on his head at the time (DeGailler Dep. 28:5-7), consistent with wearing no goggles.

DeGailler was not specifically asked about whether he had his goggles on, but he later testified that when he goes out to ride his motorcycle, he tries to check himself before he leaves his house to make sure that he has his helmet and goggles. (Id. 112:2-6; Resp. to SMF [Docket Item 224-3] ¶ 213.) In his response to Defendants' interrogatory, DeGailler also noted the particular type of goggles he wears for riding his motorcycle. (DeGailler Interrogatory Resp. 17 [Docket Item 246-3] at 5-6.) DeGailler's helmet was later found by the Southampton Township Municipal Court to be in compliance with regulations for motorized bicycles. (Pl. Ex. B [Docket Item 224-6].) As explained in Part IV.A below, Carlini mistakenly wrote the motorcyclists a ticket under N.J.S.A. 39:4-14.3q (the motorized bicycle helmet statute), rather than the more demanding motorcycle helmet statute, N.J.S.A. 39:3-76.8.

Defendants note that New Jersey regulations also require

helmets to have a reflective strip. See N.J.A.C. 13:25-9.3. Carlini testified during his deposition that he believed all of the motorcyclists' helmets were illegal because they did not have a windshield or goggles. (See Carlini Dep. 42:8-20; 88:18-89:2.) He did not mention the lack of reflective tape during his deposition or during the traffic stop. DeGailler brought his helmet to his deposition on December 13, 2013. He testified that the helmet had reflective tape on it the on the day of the incident, but that he had since removed the tape and placed it on a newer helmet. (Id. 186:18-187:16.)

DeGailler joined the Tribe Motorcycle Club in 2003 or 2004, and joined the Pagan's Motorcycle Club in 2006. (SMF ¶¶ 219-220.) He rides his motorcycle approximately once or twice a week with other Pagan's members. DeGailler testified at his December 13, 2013 deposition that the stop in question was the only time he had been stopped since joining the Tribe. (SMF ¶¶ 222-24; DeGailler Dep. 47:13-48:13.) He testified that although he does not get stopped, he nonetheless believes he receives more scrutiny from officers when he is riding on the freeway wearing his "colors." (DeGailler Dep. 53:20-54:9.) Such scrutiny resulted in no other stops.

## III. STANDARD OF REVIEW

At summary judgment, the moving party bears the initial

burden of demonstrating that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once a properly supported motion for summary judgment is made, the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). In reviewing a motion for summary judgment, the court is required to examine the evidence in light most favorable to the non-moving party, and resolve all reasonable inferences in that party's favor. Hunt v. Cromartie, 526 U.S. 541, 552 (1999); Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007).

A factual dispute is material when it "might affect the outcome of the suit under the governing law," and genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. The non-moving party "'need not match, item for item, each piece of evidence proffered by the movant,'" but must simply present more than a "mere scintilla" of evidence on which a jury could reasonably find for the non-moving party. Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (quoting Anderson, 477 U.S. at 252).

The Court exercises subject matter jurisdiction over Plaintiff's 42 U.S.C. § 1983 claims pursuant to 28 U.S.C. § 1331, and exercises supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

In the present case, there is no genuine dispute of any material facts, especially as we are aided by the full video and audio recording of the stop and of the officers' discussions with DeGailler and the other motorcyclists and passengers at the scene.

## IV. DISCUSSION

### A. Fourth Amendment Claim

Plaintiff argues that his Fourth Amendment rights were violated when Defendants stopped the motorcyclists for wearing colors without reasonable suspicion of wrongful activity. He also argues that the prolonged length of the stop violated the Fourth Amendment. (SAC ¶ 212, 221.)

Defendants counter that reasonable suspicion existed because two of the motorcyclists admitted that their helmets were illegal, and DeGailler's helmet was also illegal. Defendants also argue that taken as a whole, the duration of the stop was not unreasonable, and the last four minutes of the stop after Carlini issued DeGailler his ticket and told the motorcyclists to remove their jackets, even if unlawful, were de

13

minimis, and this period was necessitated by valid reasons, and
it did not violate the Fourth Amendment. (Def. Br. at 10-23.)

The Fourth Amendment protects individuals "against
unreasonable searches and seizures." U.S. Const. amend. IV. A
traffic stop is a "seizure" within the meaning of the Fourth
Amendment, "even though the purpose of the stop is limited and
the resulting detention quite brief." Delaware v. Prouse, 440
U.S. 648, 653 (1979); see also United States v. Arvizu, 534 U.S.
266, 273 (2002); United States v. Delfin-Colina, 464 F.3d 392,
396 (3d Cir. 2006). Consistent with the Fourth Amendment, an
officer may conduct a brief investigatory stop when he has
reasonable, articulable, and individualized suspicion that
criminal activity is afoot. United States v. Lowe, 791 F.3d 424,
434 (3d Cir. 2015).

Reasonable suspicion is a "less demanding standard than
probable cause and requires a showing considerably less than
preponderance of the evidence." Illinois v. Wardlow, 528 U.S.
119, 123 (2000). To determine whether an investigatory stop is
justified, a court undertakes an objective review of the
officer's rationale and "should only look to whether specific,
articulable facts produced by the officer would support
reasonable suspicion of a traffic infraction." Delfina-Colina,
464 F.3d at 398; see also Whren v. United States, 517 U.S. 806,

14

813 (1996) ("We think these cases foreclose any argument that
the constitutional reasonableness of traffic stops depends on
the actual motivations of the individual officers involved.").

This past term, in Rodriguez v. United States, 135 S. Ct.
1609 (2015), the Supreme Court emphasized that an investigatory
traffic stop violates the Fourth Amendment if it "exceed[s] the
time needed to handle the matter for which the stop was made,"
even if the stop is prolonged by only a few minutes. 135 S. Ct.
at 1612. In so holding, the Court specifically rejected the
Eighth Circuit's reasoning that a "seven- or eight- minute
delay" of a traffic stop to perform a dog sniff once a warning
ticket had already been issued to the driver was permissible
because it amounted to only a de minimis intrusion on the
driver's Fourth Amendment rights. Id. at 1613-15. The Court
emphasized that that its decision in Rodriguez did not announce
a new rule but merely reiterated a long-standing principle,
articulated in Illinois v. Caballes, 543 U.S. 405 (2005) and
Arizona v. Johnson, 555 U.S. 323, 330 (2009), that Fourth
Amendment seizures remain lawful "only 'so long as [unrelated]
inquiries do not measurably extend the duration of the stop.'"
Rodriguez, 135 S. Ct. at 1614 (quoting Johnson, 555 U.S. at
333).

Defendants argue that there was reasonable suspicion for

15

the initial traffic stop. Carlini testified that he saw several
helmet violations as the motorcyclists drove by, and it was on
that basis that he initiated the stop. Carlini further testified
that the motorcyclists were traveling in a pack and pulled over
as a group when Defendants turned on their lights. There is no
dispute that all motorcyclists, including DeGailler, were
traveling as a group in formation on the highway when they were
directed to pull over. Two motorcyclists later pled guilty to
wearing illegal helmets, which supports Defendants' argument
that, viewing the evidence objectively, reasonable suspicion
existed that some of the motorcyclists were in violation of
traffic laws. Plaintiff has not pointed to any evidence showing
that Defendants could have initiated a traffic stop with only
those individuals suspected of wearing illegal helmets. Nor is
Plaintiff's argument of pretext convincing, since the Fourth
Amendment inquiry involves an assessment of whether an officer's
actions were objectively supported by the facts available "and
not on the officer's actual state of mind at the time the
challenged action was taken." Maryland v. Macon, 472 U.S. 463,
470-71 (1985); see also United States v. Johnson, 63 F.3d 242,
246-47 (3d Cir. 1995) ("'Both the Supreme Court and this court
have held that a seizure that is valid based upon the stated
purpose cannot be challenged on the grounds that the seizing

16

officers were in fact motivated by an improper purpose.'"
(quoting United States v. Hawkins, 811 F.2d 210, 214 (3d Cir.
1987))). Under these facts, no reasonable jury could find that
the initial traffic stop was unsupported by reasonable suspicion
of a traffic violation involving the helmets of these
motorcyclists.

Nonetheless, Plaintiff argues that Defendants had no
individualized suspicion that Plaintiff himself had committed a
traffic infraction, because, he says, the facts show that his
own helmet complied with regulations. The Court does not agree.
Plaintiff points out only that he was never directly asked
whether he had goggles on during his deposition. He testified
that when he goes out to ride his motorcycle, he tries to check
himself before he leaves his house to make sure that he has his
helmet and goggles. In a response to Defendants' interrogatory,
he stated the particular type of goggles he wears when he rides
his motorcycle. Plaintiff's general statements about his habit
of wearing goggles while riding provides, at best, weak
circumstantial evidence that he was using goggles on the day of
the incident. Particularly in light of his other testimony that
he was wearing nothing else on his head that day other than his
helmet and brought nothing but the helmet to his deposition, and
Carlini's testimony that all of the motorcyclists had improper

17

helmets and no eyewear, the evidence Plaintiff has set forth is
insufficient to raise a genuine factual dispute.[4]

Nor could a reasonable jury find that the duration of the
traffic stop violated the Fourth Amendment. In addition to
determining whether to issue a traffic ticket, Defendants made
"ordinary inquiries incident to the [the traffic] stop,"
including checking each person's license, determining whether
there were outstanding warrants against any of the
motorcyclists, and inspecting each motorcyclist's registration
and proof of insurance. Illinois v. Caballes, 543 U.S. 405, 408
(2005). Because the computer in Carlini's car was not working,
Carlini had to do "look-ups" by relaying each passenger's
information into dispatch over the car radio. In the meantime,
Trooper Manuel was writing tickets for each motorcyclist for
having an unauthorized helmet, and Carlini can be heard telling

---

[4] That the municipal court ultimately found Plaintiff's helmet in
compliance with the law is not persuasive evidence that
Plaintiff was wearing goggles. Carlini mistakenly wrote the
motorcyclists a ticket under N.J.S.A. 39:4-14.3q, the motorized
bicycle statute, instead of the motorcycle statute, N.J.S.A.
39:3-76.8. Persons on motorized bicycles must wear a "protective
helmet of a type approved by the director," see N.J.S.A. 39:4-
14.3q, but the motorized bicycle statutes do not appear to
require a helmet with a face shield or goggles. The municipal
court found that Plaintiff's helmet complied with the motorized
bicycle helmet regulations, and provides no support for
Plaintiff's argument that his helmet complied with *motorcycle*
helmet regulations as they pertain to the requirement of face
shield or goggles.

Manuel, who was still learning patrol duties such as ticket-writing, to write quickly. Moreover, because Ballinger had a suspended license and a restraining order, Defendants had to do an additional check on whether the restraining order applied to his passenger. Defendants performed checks on seven individuals in total – the six motorcyclists and a passenger – over the course of an hour, which averages out to less than nine minutes per person. Under these circumstances, no rationale jury could find the length of the traffic stop unreasonable under the Fourth Amendment.

Finally, the Court rejects Plaintiff's argument that Defendants unlawfully prolonged the traffic stop by approximately four minutes when, after passing out the traffic tickets, Trooper Carlini told the motorcyclists to take their jackets off. While Plaintiff is correct that a traffic stop may not be extended beyond the time necessary to issue a warning or ticket, see Rodriguez, 135 S. Ct. at 1614-15 and Caballes, 543 U.S. at 407, it is clear that in this instance, the stop was not prolonged with Carlini's speech. According to the transcript of the stop, Carlini made his statement immediately upon handing out the traffic tickets but *before* a remaining necessary task could be handled:

> You guys are all receiving tickets for not having an authorized helmet. Okay?

19

```
Motorcyclist: May I have a complaint form, please?
Trooper Carlini: What's that?
Motorcyclist: I need a complaint form, please.
Trooper Carlini: Yeah, sure. Hold on, all right.
(Brief pause.)
Now, you're all going to take your jackets off. On this
highway, these are the only colors you wear. . . .
```

(Traffic Video Tr. 44:1-14.) Because one of the motorcyclists

asked for a complaint form, and because Carlini had yet to call

the tow truck to tow Ballinger's motorcycle, the stop was not

yet over when Carlini made his "anti-colors" remark to Plaintiff

and the others. After Carlini made the call and passed out the

complaint form, he immediately told the group that they were

free to leave. No reasonable juror could find under these facts

that Defendants prolonged the seizure "beyond the time

reasonable required to complete [the] mission [of the stop]."

Caballes, 543 U.S. at 407.

    For these reasons, the Court will grant summary judgment

for Defendants on Plaintiff's Fourth Amendment claim.

### B. First Amendment Claim

    Defendants make two primary arguments for the dismissal of

Plaintiff's First Amendment claims. First, they argue that the

wearing of Pagan's "colors" is not protected by the First

Amendment because Pagan's is not engaged in expressive activity.

Second, they argue that with respect to Carlini's command to the

motorcyclists to remove their jackets, Carlini's statement alone

did not deprive Plaintiff of his First Amendment rights and was merely an "attempt" to violate Plaintiff's rights. (Def. Br. at 23-31.) Defendants suggest that Plaintiff suffered no actual injury from Carlini's words. (See Def. Reply Br. [Docket Item 232] at 20-21.) While Plaintiff had an associational right under the First Amendment to wear Pagan's "colors," the Court must grant summary judgment on Plaintiff's First Amendment claim because the evidence is insufficient to show that Plaintiff has suffered a cognizable injury of First Amendment associational or expressive rights.

The Supreme Court has long recognized that implicit in the right to engage in activities protected by the First Amendment is a right to "associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." Roberts v. United States Jaycees, 468 U.S. 609, 622 (1984).[5] This right to expressive association is a

---

[5] With respect to whether the wearing of motorcycle "colors" is expressive conduct, the Court notes that Defendants have never, either in their motion to dismiss, cross-motion for summary judgment, or any other pleading filed in the five years this case has proceeded, raised the argument that the wearing of "colors" was not entitled to First Amendment protection. (See Mar. 29, 2012 Op. at 23 ("It is undisputed by the parties that it is a fundamental First Amendment Right to wear motorcycle club colors on public roadways.").) Nevertheless, because Plaintiff has not argued that Defendants are barred by the doctrine of judicial estoppel, and because the Court has not expressly ruled on this issue, the Court will address Defendants' argument.

derivative right, implied from the First Amendment in order to assure the meaningful exercise of rights expressly secured by the First Amendment. In other words, the expressive associational right is reserved for groups that engage in some form of protected expression, and "there is no constitutional right to associate for a purpose that is not protected by the First Amendment." Salvation Army v. Dep't of Comty. Affairs of New Jersey, 919 F.2d 183, 199 (3d Cir. 1990); see also Boy Scouts of Am. v. Dale, 530 U.S. 640, 648 (2000).

In general, the Supreme Court "has cast a fairly wide net in its definition of what comprises expressive activity," Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh, 229 F.3d 435, 443 (3d Cir. 2000). Thus, the Court has said that members of a group who "regularly engage in a variety of civic, charitable, lobbying, fundraising, and other activities" are entitled to constitutional protection. Roberts, 486 U.S. at 626-27.

Neither party has cited to a case in this Circuit involving the First Amendment expressive associational rights of motorcycle clubs, and the Court finds no controlling precedent in this Circuit on this particular issue. However, Plaintiff has submitted evidence that at least some of the activities undertaken by Pagan's - including the event to which the

22

motorcyclists were driving the day of the stop – could be found by a reasonable jury to be protected by the First Amendment. Plaintiff asserts that "it is the policy and custom of the Pagans Motorcycle Club to sponsor, attend and support charitable events." He further assert that Pagan's has supported the Philadelphia Toy Run held every year for the last 30 years, the Children's Hospital of Philadelphia, and the Marine Corps Toys for Tots." (DeGailler Aff. ¶ 19.)

"Prior authorities [] clearly establish that charitable appeals for funds . . . involve a variety of speech interests – communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes – that are within the protection of the First Amendment." Vill. of Schaumburg v. Citizens for a Better Env't, 440 U.S. 620, 632 (1980). Sponsoring and supporting charitable community events, like the solicitation of funds, "is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues." Id. At the time the motorcyclists were stopped, they were on their way to such a charity event, and a reasonable jury could find that they were entitled to some constitutional protection based on the specific activity they were engaged in, and Plaintiff's association with the group for

23

that purpose was also protected by the First Amendment.

Defendants cite to a Ninth Circuit case, Villegas v. City of Gilroy, to support their argument that Pagan's Motorcycle Club is not engaged in any expressive activity that is entitled to protection under the First Amendment. Villegas, 484 F.3d 1136, 1141 (9th Cir. 2009) aff'd on other grounds, Villegas v. Gilroy Garlic Festival Ass'n, 541 F.3d 950 (9th Cir. 2008). The plaintiffs in Villegas were members of the Top Hatters Motorcycle Club who alleged violations of their First Amendment rights when police officers stopped them for wearing their motorcycle club "colors" at a city garlic festival because their clothing violated the festival's dress code prohibiting gang colors "or other demonstrative insignia, including motorcycle club insignia." Plaintiffs were asked to remove their vests, and when they refused, they were escorted out of the festival. 484 F.3d at 1138. The Ninth Circuit panel dismissed the plaintiff's expressive association claim because there was "no evidence that the plaintiffs' club engaged in the type of expression that the First Amendment was designed to protect." Id. at 1142.

The Court does not find Villegas persuasive here. First, in finding that the club did not engage in protected expression, the Villegas court specifically noted that Villegas answered "no" when asked during deposition whether the club advocated any

political, religious, or other viewpoints. 484 F.3d at 1142. By
contrast, there is some evidence in this case that Pagan's
sometimes promotes civic engagement among its members, and a
jury could therefore find that Pagan's sometimes engages in
expressive activity protected by the First Amendment.
Additionally, the Villegas panel noted that by removing the
plaintiffs from the garlic festival, the defendants were not
preventing the plaintiffs from pursuing their stated purpose of
"riding motorcycles, giving to charity and promoting good will."
484 F.3d at 1142. A reasonable jury could find that, unlike in
Villegas, Plaintiff was engaged in expressive activity at the
time of the stop. Plaintiff asserts that the group was on their
way to a charitable event – a benefit on behalf of a sick child
– when they were stopped by Defendants, and there is some
evidence that Defendants were aware of the fundraiser and knew
the group was traveling to a charity event.

Finally, although the plaintiffs in Villegas were not
permitted to wear their "colors," the restriction was limited to
a particular event at a particular location due to concern for
gang-oriented violence. Here, Plaintiff was stopped on a public
freeway and was told, in sum and substance, that the Pagan's
"colors" were not permitted anywhere on the road at any time, a
restriction that, if enforced, is far broader in reach than that

25

in Villegas. The Court does not believe Villegas to be
persuasive to the facts in this case.[6] A reasonable jury could
find that Plaintiff, by wearing Pagan's "colors" and attending a
Pagan's-sponsored charity benefit, was engaged in expressive
conduct protected by the First Amendment. See Piscottano v.
Murphy, 511 F.3d 247, 274 (2d Cir. 2007) (by consorting with
motorcycle club members and wearing club colors, plaintiffs
approved of a club criticized by others and thus engaged in
expressive conduct on a topic of public concern).

Citing to Roberts and NAACP v. Caliborne Hardware Co., 458
U.S. 886, 916 (1982), Defendants argue that the wearing of
"colors" is not entitled to First Amendment protection because
the evidence in the record "indicates only that the Pagans are
an organization that uses violence and engages in other criminal
activities." (Def. Br. at 26.) Defendants note that the Pagan's
Motorcycle Club's Constitution includes an indemnification
clause for members who are arrested on club business, "such as

---

[6] The Court also notes that in later granting rehearing en banc,
the Ninth Circuit stated that the panel opinion "shall not be
cited as precedent . . . except to the extent adopted by the en
banc court." Villegas v. Gilroy Garlic Festival Ass'n, 503 F.3d
974, 974 (9th Cir. 2007). The en banc court subsequently
affirmed the panel's decision that no First Amendment violation
occurred, but on the alternate basis that the Garlic Festival
organizer was not a state actor for purposes of § 1983. See
Villegas v. Gilroy Garlic Festival Ass'n, 541 F.3d 950, 957 (9th
Cir. 2008).

robbing a bank," and cites to several cases in which courts have described Pagan's as a criminal organization. (Id. at 26-27.)

The Supreme Court has indeed made clear that the First Amendment does not protect violence. See Claiborne, 458 U.S. at 916 ("'Certainly violence has no sanctuary in the First Amendment, and the use of weapons, gunpowder, and gasoline may not constitutionally masquerade under the guise of 'advocacy.'" (quoting Samuels v. Mackell, 401 U.S. 66, 75 (1971))). However, the Court in Claiborne also explained that while the government may restrict a group's expressive activity when violence is involved, "precision of regulation is demanded," and a careful distinction must be made between violent expression and non-violent expression. Claiborne, 458 U.S. at 916-18. Thus, the Court held that individuals who participated in civil rights boycotts could be held liable only for damages resulting from their direct participation in violent activity. They could not be held liable for damages from nonviolent boycotts, which is protected by the First Amendment. Id. at 915.

Defendants' attempt to suggest that the Pagan's Motorcycle Club encourages its members to commit criminal activity addresses only one aspect of the Pagans' unenviable history. There is no evidence that the individuals stopped by Defendants that day were engaging in criminal or violent conduct. In fact,

27

there is some evidence that Defendants knew they were not, since Carlini was told by another trooper before his "anti-colors" remark that the individuals were on their way to a charity event to raise money for a sick child.

With respect to DeGailler in particular, Defendants have pointed to no evidence that by merely wearing Pagan's "colors," Plaintiff was involved in or associated with the alleged violent or criminal activity of other Pagan's members. It is a fundamental principle that the government may not impose restrictions on an individual "merely because an individual belong[s] to a group, some members of which committed acts of violence." Id. at 920. In fact, the Supreme Court has long "disapproved governmental action . . . denying rights and privileges solely because of a citizen's association with an unpopular organization." Healy v. James, 408 U.S. 169, 185-86 (1972). In Healy, the Court held that a student group could not be denied recognition at a state college merely because of its affiliation with a national organization associated with disruptive and violent campus activity. Noting that guilt by association alone "is an impermissible basis upon which to deny First Amendment rights," the Court expressly stated that "[t]he government has the burden of establishing a knowing affiliation with an organization possessing unlawful aims and goals, and a

*specific intent* to further those illegal aims." 408 U.S. at 186
(emphasis added); see also Scales v. United States, 367 U.S.
203, 229 (1961) (noting that to punish association with a group
having both legal and illegal aims, there must be "clear proof
that a defendant 'specifically intend[s] to accomplish [the aims
of the organization] by resort to violence.'" (quoting Noto v.
United States, 367 U.S. 290, 299 (1961))).

Plaintiff brings this case on his own behalf, not on behalf
of Pagan's Motorcycle Club, and asserts the violation of his own
First Amendment rights. The inquiry must therefore focus on
Plaintiff's personal intent, and not the intent or purpose of
the Pagan's, to engage in violent or criminal activity. "[M]ere
association with [a] group — absent a specific intent to further
an unlawful aim embraced by that group — is an insufficient
predicate for liability." Claiborne, 458 U.S. at 925-26.
Defendants have made no suggestion that DeGailler was engaging
in criminal or violent activity that falls outside the ambit of
the First Amendment, and their conduct cannot be justified by
merely arguing that all Pagan's members commit criminal
activity. (See Def. Br. at 26-27 (listing cases in which Pagan's
members have been found guilty of conspiracy to sell controlled
substances, transport firearms, and commit murder and
kidnapping).) To permit Defendants to object to any person on

public roads who wears the insignia of Pagan's, without regard

to or knowledge of that individual's specific intent to engage

in the alleged violent activities committed by other members, is

antithetical to the basic principles enshrined in the First

Amendment and repugnant to the fundamental doctrine of personal

guilt that is a hallmark of American jurisprudence.

Nevertheless, Plaintiff's First Amendment claim ultimately

fails because no reasonable jury could find that Plaintiff

suffered an injury from Carlini's words.[7] Plaintiff did not take

off his jacket at Carlini's empty threat and therefore did not

---

[7] Defendants' argument, that Plaintiff has not shown an actual
deprivation because Trooper Carlini's comments alone "did not
deprive DeGailler of any constitutional right," appears to be
that Plaintiff lacks Article III standing because he cannot show
an injury-in-fact. (Def. Br. at 30 (citing Andree v. Ashland
Cnty., 818 F.2d 1306, 1311 (7th Cir. 1987)).)
     Before a litigant is entitled to have a federal court
decide the merits of a dispute, he must satisfy standing
requirements under the Constitution and show that he has
suffered an "injury-in-fact" – he must allege a "personal injury
fairly traceable to the defendant's allegedly unlawful conduct
and likely to be redressed by the requested relief." Allen v.
Wright, 468 U.S. 737, 751 (1984). Specifically, the plaintiff
must show the invasion of a legally protected interest that is
(1) concrete and particularized, and (2) actual or imminent, not
conjectural or hypothetical. Lujan v. Defenders of Wildlife, 504
U.S. 555, 560 (1992). Thus, for example, when a plaintiff is
given a letter banning him from school property and events and
from interacting with employees from a school district, the
letter itself is insufficient to satisfy the injury-in-fact
requirement. The plaintiff must show that he made an actual
attempt to enter school property or to contact school district
employees, and suffered repercussions for doing so. Woodend v.
Lenape Regional High Sch. Dist., 535 Fed. App'x 164, 167 (3d
Cir. 2013).

give up his First Amendment right to wear Pagan's "colors." Nor could a reasonable jury find that Plaintiff was retaliated against for his refusal to obey. Defendants had already issued Plaintiff an unlawful helmet citation before Carlini mentioned "colors" with less than four minutes left in the traffic stop. No reasonable interpretation of the record could support a conclusion that the citation was retaliation for Plaintiff's asertion of his First Amendment rights. As already explained, the evidence in the record shows that the citation was justified because Plaintiff's helmet did indeed violate regulations. Moreover, the citation was given to Plaintiff and the record checks and ticket-writing for all were concluded before Carlini ordered to the motorcyclists to take off their jackets; thus, no causal conection may be inferred between Plaintiff's refusal to comply and the issuance of the ticket. There simply was no "colors" comment made to Plaintiff before his summons was issued.

Nor could a reasonable jury find, based on the record now before the Court, that Plaintiff was subject to an additional four-minute period of detention because of Carlini's "colors" comment. As noted above, the detention of the motorcyclists was not unnecessarily prolonged after Carlini's remarks because Defendants had not yet completed the tasks incident to the

traffic stop when Carlini made his speech. Defendants still needed to call a tow truck and give one of the motorcyclists a complaint form, and the video showed that once the complaint form was promptly retrieved from the trooper's vehicle and passed out, the motorists were told they were free to leave.[8]

Citing and Lovell v. Griffin, 303 U.S. 444 (1938) and Startzell v. Fischer, 533 F.3d 183 (3d Cir. 2008), Plaintiff

---

[8] Defendants make a separate argument that Plaintiff has no standing to claim that his own First Amendment rights were violated when Defendants threatened to tow Mr. Ballinger's motorcycle if the motorcyclists did not take off their jackets, because Plaintiff has no legal interest in Mr. Ballinger's motorcycle. (Def. Br. at 53-54.) The Court agrees that Plaintiff has no cognizable claim under the First Amendment concerning the Ballinger motorcycle, but for different reasons. Plaintiff claims in his Amended Complaint that Defendant's threat to tow Mr. Ballinger's motorcycle was "retaliation for wearing colors on the highways of New Jersey," in violation of Plaintiff's First Amendment rights. (SAC ¶ 226.) In order to demonstrate retaliation under the First Amendment, a plaintiff must show: (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action. Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006). Here, Defendant merely threatened to tow Mr. Ballinger's motorcycle if Plaintiff did not take off his "colors," but the motorcycle was not actually towed. No reasonable jury could find that the mere threat to tow a fellow member's motorcycle would deter a person of ordinary firmness from exercising his constitutional rights. Indeed, it did not do so here, as the Ballinger situation was sensibly resolved by having a Ballinger friend come to the scene, licensed to operate a motorcycle, who drove it away without towing. Moreover, Plaintiff has pointed to no evidence from which a reasonable jury could find that Plaintiff's First Amendment rights were actually chilled by Defendants' empty threat.

urges the Court to hold that Carlini's words alone were sufficient to constitute an injury under the First Amendment. The Court disagrees. Plaintiff is correct that <u>Lovell</u> and <u>Startzell</u> stand for the broad proposition that police generally may not target or restrict speech based on content, but neither case supports Plaintiff's argument that police orders "are in and of themselves . . . void . . . where they are not manifestly content-neutral on their face." (Pl. Br. at 18.) On the contrary, it was apparent in both cases that the plaintiff had suffered an injury sufficient to establish Article III standing. In <u>Lovell</u>, the plaintiff was convicted for disobeying a city ordinance banning the distribution of pamphlets, and was sentenced to fifty days' imprisonment. 303 U.S. at 447. Likewise, the plaintiff in <u>Startzell</u> was arrested by police officers and incarcerated for twenty-one hours before charges were ultimately dropped. 533 F.3d at 191. The question of whether the plaintiff had suffered a cognizable injury was not raised or addressed in either case, for clearly each had suffered a significant injury. Plaintiff in this case stands in a distinctly different posture. He was told to remove his jacket, he did not do so, and he was allowed to go on his way.

Because no reasonable jury could find that Plaintiff suffered a cognizable injury from Carlini's statement to the

motorcyclists to take off their "colors," the Court will grant
summary judgment in Defendant's favor and dismiss Plaintiff's
First Amendment claims.

### C. Equal Protection Claim

The equal protection clause protects both unlawful
classifications of people as well as government discrimination
among people in the exercise of a fundamental right. See Skinner
v. Oklahoma, 316 U.S. 535 (1942); Capital Cities Media, Inc. v.
Chester, 797 F.2d 1164, 1192-93 (3d Cir. 1986) (Adams, J.,
concurring) (noting that the fundamental rights body of equal
protection case law is an independent basis for claiming relief
for infringement on freedom of speech). When an individual
alleges that government discrimination is based upon the
exercise of a fundamental right, strict scrutiny applies, and
the restriction passes constitutional muster only if it is
narrowly tailored to an important government objective. See
Police Dept. of City of Chicago v. Mosley, 408 U.S. 92, 98-99
(1972) ("Because picketing plainly involves expressive conduct
within the protection of the First Amendment, discriminations
among pickets must be tailored to serve a substantial
governmental interest" under an equal protection analysis).

Plaintiff argues that his Fourteenth Amendment equal
protection claim should proceed because there remains a factual

dispute whether Plaintiff's First and Fourth Amendment rights have been violated. (Pl. Br. at 21-22.) However, since the Court holds that Plaintiff has not plausibly alleged that his First or Fourth Amendment rights have been violated, no equal protection claim remains under this theory. Accordingly, the Court will dismiss this claim.

### D. Qualified Immunity

The doctrine of qualified immunity protects government officials liability for civil damages as long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Kelly v. Borough of Carlisle, 622 F.3d 248, 253 (3d Cir. 2010). Although qualified immunity "protects all but the plainly incompetent," Malley v. Briggs, 475 U.S. 335, 341 (1986), it does not act as a shield for "the official who knows or should know he is acting outside the law." Butz v. Economou, 438 U.S. 478, 506-07 (1978).

The qualified immunity claim is traditionally analyzed in two steps. First, the court must decide whether the facts alleged, taken light most favorable to the plaintiff, makes out the violation of a constitutional right. Saucier v. Katz, 533 U.S. 194, 201 (2001). Next, the court must examine whether the right at issue was "clearly established" at the time of the

challenged conduct. To be "clearly established," a right must be sufficiently clear such that a reasonable official would have known that his conduct was unlawful. Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012). The two prongs to the qualified immunity inquiry need not be analyzed in sequential order; courts have discretion to decide which of the two prongs to tackle first. al-Kidd, 131 S. Ct. at 2080; Pearson, 555 U.S. at 236.

The Court has already concluded that Plaintiff's constitutional rights have not been violated; thus, it is unnecessary to determine whether Plaintiff's rights were clearly established at the time of the injury. See Saucier, 533 U.S. at 201 ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

**E. The Court will Dismiss Claims for Injunctive Relief**

Plaintiff seeks an injunction to restrain Defendants from harassing or infringing upon the constitutional rights of members of motorcycle clubs to wear collective membership marks or colors. (SAC ¶ 263.) However, according to Plaintiff's own affidavit, he is no longer a member of Pagan's Motorcycle Club. Plaintiff certified in an affidavit dated April 6, 2015 that he terminated his club membership about 6 months ago. (See April 6, 2015 Aff., Pl. Ex. J [Docket Item 224-11] ¶ 20.) At oral

36

argument, both parties agreed that Plaintiff no longer had standing to seek injunctive relief because Plaintiff will no longer wear club "colors." The Court will therefore dismiss Plaintiff's claims for injunctive relief.

### F. The Court will Dismiss Claims Against Colonel Fuentes

Defendants argue that Colonel Joseph Fuentes must be dismissed as a defendant because Plaintiff cannot show that the individual officers' actions were part of a custom or policy to deprive motorcycle club members of their constitutional rights, or that Fuentes was responsible for such a policy or had any personal knowledge of such a custom. (Def. Br. at 39-43.)

Plaintiff concedes that he has no direct evidence that Fuentes is personally responsible for the officers' actions, but argues that "the systematic nature of the anti-colors police orders and related procedures during a police detention fairly create an inference of premediated activity of which a Superintendent of the New Jersey State Police duly concerned with civil rights enforcement must be vigilant and not blind." (Pl. Br. at 24.) Plaintiff argues that Carlini's reference to his "no-colors" speech three times in his troop car is "direct evidence that the speech reflected an ongoing policy of the New Jersey State Police." (Pl. Sur-Reply at 15.)

37

Plaintiff sues Colonel Fuentes in his capacity as Superintendent of the New Jersey State Police but does not specify whether Fuentes is being sued in his personal or official capacity. Because Plaintiff has pointed to no evidence that Fuentes caused a deprivation of Plaintiff's constitutional rights, nor has Plaintiff even attempted to specify Fuentes' personal role in the traffic stop, the Court will dismiss all claims against Fuentes in his personal capacity.[9]

The Court next addresses whether Plaintiff has any claims against Fuentes in his official capacity. An official-capacity suit against a state officer "is not a suit against the official but rather is a suit against the official's office. As such it is no different from a suit against the State itself." Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989) (citation omitted). Thus, the Court will treat Plaintiff's official-capacity claim against Fuentes as a suit against the State. Kentucky v. Graham, 473 U.S. 159, 166 (1985).

---

[9] A personal capacity suit seeks to impose personal liability upon a government official for actions he takes under color of state law. Kentucky v. Graham, 473 U.S. 159, 165 (1985). To establish personal liability in a § 1983 action, a plaintiff must show that "the official, acting under color of state law, caused the deprivation of a federal right." Id. at 166. A plaintiff in a personal-capacity suit "need not establish a connection to governmental 'policy or custom.'" Hafer v. Melo, 520 U.S. 21, 25 (1991).

To prevail on a § 1983 claim against the government, a plaintiff must show that the government entity was a "moving force" behind the constitutional deprivation. Polk Cnty. v. Dodson, 454 U.S. 312, 326 (1981); Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). The plaintiff must therefore show that the municipality, through one of its policymakers, affirmatively proclaimed a policy, or acquiesced in a widespread custom, that deprived the plaintiff of his constitutional rights. Hafer v. Melo, 502 U.S. 21, 25 (1991) ("'[T]he entity's policy or custom must have played a part in the violation of federal law.'" (quoting Graham, 473 U.S. at 167)); McTernan v. City of York, 564 F.3d 636, 657 (3d Cir. 2009).

Here, in the absence of a constitutional violation, Defendants cannot be held liable under § 1983. See D.R. by L.R. v. Middle Bucks Area Vocational Tech. Sch., 972 F.2d 1364, 1376 (3d Cir. 1992).

Even assuming Plaintiff's First and Fourth Amendment rights were violated, no reasonable jury could conclude from the record that the New Jersey State Police abided by an unconstitutional policy of profiling motorcyclists who wear the "colors" of their motorcycle club on the road and depriving them of their First and Fourth Amendment rights. The existence of a policy is shown when a decision-maker with final authority issues an official

39

proclamation, policy, or edict. <u>Bielevicz v. Dubinon</u>, 915 F.2d
845, 850 (3d Cir. 1990). Plaintiff has pointed to no evidence
which would suggest that lawmakers affirmatively instituted an
official policy or proclamation that caused the violation of
Plaintiff's rights.

Nor could a reasonable jury conclude from the evidence that
Defendants' actions were part of an informal custom. "Custom" is
defined as "'an act that has not been formally approved by an
appropriate decisionmaker,' but that is 'so widespread as to
have the force of law.'" <u>Natale v. Camden Cnty. Corr. Fac.</u>, 318
F.3d 575, 584 (3d Cir. 2003) (quoting <u>Bd. of Cnty. Comm'rs of
Bryan Cnty. v. Brown</u>, 520 U.S. 397, 404 (1997)); <u>see</u> <u>also</u>
<u>Bielevicz</u>, 915 F.2d at 850.

There is no evidence in the record that the traffic stop
was part of a wider pattern. Plaintiff admitted at deposition
that in the approximately ten years he had been a part of a
motorcycle club, the stop in question was the only time he had
ever been stopped while wearing his "colors." Although the
record includes seven affidavits from five motorcyclists about
their encounters with the New Jersey State Police, six of the
seven stops occurred after 2009 and after the incident in this

case.[10] Thus, the affidavits provide no support for the argument that the troopers' actions on July 30, 2009, were part of an already existing unconstitutional custom.

Plaintiff's only contention is that Carlini's "anti-colors" speech suggested that a policy or custom existed. The Court finds this argument unconvincing. No reasonable juror could find that the mere fact that Carlini made the statement, "blue and gold are the only colors that ride these roads" three times in the troop car, is enough to demonstrate that the New Jersey State Police had a custom of stopping motorcyclists who wear club "colors" on the road.

Accordingly, the Court will dismiss the § 1983 claims against Fuentes in his official capacity.

### G. Plaintiff's Abuse of Process Claim and Malicious Prosecution Claim under § 1983 and the New Jersey Civil Rights Act will be Dismissed.

Counts One and Two of Plaintiff's Second Amended Complaint state claims for malicious prosecution and abuse of process under § 1983 and under state law. Defendants seek to dismiss Plaintiff's state law claims for failing to comply with the notice requirement under the New Jersey Tort Claims Act

---

[10] The affidavits are from seven individuals and together appear to document four traffic stops: on July 30, 2009 (the same day as the stop in this case) (Def. Ex. Z7), June 2011 (Def. Exs. Z1, Z2, Z3), in September 2011 (Def. Ex. Z5), April 2012 (Def. Ex. Z4).

("NJTCA"). (Def. Br. at 54-55.) Plaintiff's Complaint did not explicitly state whether the claims in Count Two were common law claims or constitutional claims brought under the New Jersey Civil Rights Act ("NJCRA"), but paragraph 245d of the Complaint states that Plaintiff seeks "[r]easonable attorney fees, interest, and costs under N.J.S.A. 10:6-2(f)." (SAC 245d.) N.J.S.A. 10:6-2(f) refers to attorney fees and costs under the NJCRA. Additionally, Plaintiff asserts in his opposition and sur-reply that the claims in Count Two are being brought under the NJCRA. (Pl. Br. at 31-32 (stating that the notice requirement of the New Jersey Tort Claims Act "does not apply to a Civil Rights Action."); Pl. Sur-Reply at 16 (noting that the Complaint made reference to N.J.S.A. 10:6-2(f), "[a]ctions permitted under the 'New Jersey Civil Rights Act.'").)[11] Consistent with the Court's earlier opinion in this case (see Mar. 29, 2012 Op. at 35), the Court will therefore interpret Plaintiff's malicious prosecution and abuse of process claims in Count Two as claims under the NJCRA.

---

[11] Plaintiff states in his Sur-Reply that he "made direct reference to the New Jersey Tort Claims Act" in his Amended Complaint. The Court assumes that this was an error and that Plaintiff intended to state that his complaint contained a direct reference to the New Jersey Civil Rights Act, since Plaintiff then cites to N.J.S.A. 10:6-2(f) and describes the provision as "[a]ctions permitted under the New Jersey Civil Rights Act." Plaintiff's Amended Complaint in fact makes no reference to the New Jersey Tort Claims Act.

Defendant argues that Plaintiff's abuse of process claim under the NJCRA must be dismissed because the NJCRA "does not provide for the vindication of any procedural due process rights, only substantive rights." (Def. Reply at 27-28.) N.J.S.A. 10:6-2 provides a cause of action for "[a]ny person who has been deprived of any *substantive* due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State . . . ." N.J.S.A. 10:6-2 (emphasis added). The New Jersey Supreme Court has explained that the NJCRA

> protects against the deprivation of and interference with "*substantive* rights, privileges or immunities secured by the Constitution or laws of this State," . . . whereas Section 1983 protects against "the deprivation of *any* rights, privileges, or immunities secured by the Constitution and laws" . . . . Thus, Section 1983 provides remedies for the deprivation of both procedural and substantive rights while N.J.S.A. 10:6-2(c) provides remedies only for the violation of substantive rights.

Tumpson v. Farina, 95 A.3d 210, 225 (N.J. 2014) (emphasis in original). "An abuse of process is by definition a denial of procedural due process." Jennings v. Shuman, 567 F.2d 1213, 1220 (3d Cir. 1977). Plaintiff makes no argument why his abuse of process claim should not be dismissed in light of the clear statutory language of N.J.S.A. 10:6-2(c). Because the NJCRA does

not provide a remedy for a procedural due process claim, the Court will dismiss Plaintiff's claim for abuse of process.[12]

The Court next turns to Plaintiff's malicious prosecution claims. To state a claim for malicious prosecution under § 1983, a plaintiff must show that: "(1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a

---

[12] The Court will also dismiss Plaintiff's § 1983 claim for abuse of process. "[A] section 1983 claim for malicious abuse of process lies where 'prosecution is initiated legitimately and thereafter is used for a purpose other than that intended by the law.'" Rose v. Bartle, 871 F.2d 331, 350 n.17 (3d Cir. 1989) (citation omitted). Thus, "'[t]he gravamen of [a malicious abuse of process claim] is not the wrongful procurement of legal process or the wrongful initiation of criminal or civil proceedings; it is the misuse of process, no matter how properly obtained, for any purpose other than that which it was designed to accomplish.'" Dunne v. Twp. of Springfield, 500 Fed. App'x 136, 139 (3d Cir. 2012) (quoting Restatement (Second) of Torts § 682 cmt. a (1965)). Plaintiff alleges that he was subjected to abuse of process "when summons were issued not for the purpose of enforcing the motor vehicle laws of New Jersey, but for another purpose, that of discouraging them from wearing their motorcycle clubs colors on the highways of their home state, New Jersey, by subjecting them to groundless prosecution, and harassment." (SAC ¶ 230.) However, nowhere does Plaintiff allege that there was a "perversion of a process *after* [summons was] issued." Jennings v. Schulman, 567 F.2d 1213, 1218 (3d. Cir. 1977) (emphasis added). Rather, it was clear here that the proceedings in municipal court were "to determine whether [Plaintiff] was guilty of the offenses in question, which is precisely the purpose 'intended by the law.'" Dunne, 500 Fed. App'x at 139. Although Plaintiff styles his claim as an abuse of process claim, it is clear from the allegations that Plaintiff's claim is really for malicious prosecution, which the Court addresses below.

purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered [a] deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." McKenna v. City of Philadelphia, 582 F.3d 447, 461 (3d Cir. 2009). The element of malice may be inferred from a lack of probable cause. Robinson v. Jordan, 804 F. Supp. 2d 203, 206 (D.N.J. 2011).

Defendants argue that malicious prosecution requires the plaintiff to show "'some onerous types of pretrial-non-custodial restrictions,'" and "the issuance of a traffic citation and a subsequent appearance in court will not satisfy this element." (Def. Reply at 27 (quoting DiBella v. Borough of Beachwood, 407 F.3d 599, 603 (3d Cir. 2005)).) The Court agrees with Defendants that Plaintiff's § 1983 malicious prosecution claim must be dismissed. In DiBella, the Third Circuit held that the plaintiffs had no claim for malicious prosecution under 42 U.S.C. § 1983 because they could not satisfy the fifth element of the claim, which requires an individual to show that he suffered a "seizure significant enough to constitute a Fourth Amendment violation." Id. at 603. Because Plaintiff was only issued a summons and was never arrested or required to post bail before trial, he did not suffer any pre-trial deprivation of liberty addressable by the Fourth Amendment. Id. (plaintiffs'

45

liberty "was restricted only during the Municipal Court trials
and the Fourth Amendment does not extend beyond the period of
pretrial restrictions.") Likewise, in this case, Plaintiff was
never arrested, nor was his liberty restrained in any way before
his appearance in municipal court. Because the evidence is
insufficient as a matter of law to show that Plaintiff suffered
a deprivation of liberty "as a consequence of a legal
proceeding," Plaintiff's § 1983 malicious prosecution claim must
be dismissed. See Batiz v. Brown, No. 12-581, 2013 WL 1137531,
at *6 (D.N.J. Mar. 14, 2013) (dismissing malicious prosecution
claim because the plaintiff had not alleged whether she was
subject to restrictions on her liberty after legal process had
been issued.).

    The Court also finds that Plaintiff's malicious prosecution
claim under the NJCRA fails as a matter of law. At oral
argument, the Court noted that, unlike a claim of malicious
prosecution under 42 U.S.C. § 1983 the tort of malicious
prosecution has only four elements under New Jersey law, and
Plaintiff need not show that he suffered a deprivation of
liberty. See LoBiondo v. Schwartz, 970 A.2d 1007, 1022 (N.J.
2009); (reciting first four elements for a malicious prosecution
claim); Lind v. Schmid, 337 A.2d 365, 368 (N.J. 1975) (same).
Because neither party had briefed this specific issue, the Court

46

accepted supplemental submissions on whether the fifth element –
deprivation of liberty – must be shown to prove malicious
prosecution under the NJCRA.

Defendants now argue that the fifth element must be proven
for both a § 1983 malicious prosecution claim and a claim under
New Jersey state law. Relying primarily on Vickey v. Nessler,
553 A.2d 34 (N.J. Super. Ct. App. Div. 1989), Defendants argue
that a prosecution for a traffic violation is a civil, not a
criminal proceeding. See Vickey, 533 A.2d at 38 (noting that
"traffic offenses in this State are not criminal offenses and
are tried in the municipal courts in a summary manner.") Because
there is no arrest or deprivation of a property right in a
typical civil case, malicious prosecution claims involving civil
proceedings require the plaintiff to show that he suffered a
"special grievance" in addition to the first four elements. Id.
at 146-47. Thus, the court in Vickey dismissed a malicious
prosecution claim based on the prosecution of a traffic
complaint because the plaintiff "failed to establish a special
grievance" – he was not arrested or incarcerated, nor was there
a risk that his license would be revoked. Id. at 150.

The Court finds Vickey instructive for the tort of
malicious prosecution; however, in this case, Plaintiff pleads
malicious prosecution under the NJCRA, and the cases cited by

47

Defendants provide no insight into the required elements under the NJCRA.

Nevertheless, dismissal of Plaintiff's malicious prosecution claim under the NJCRA is warranted. Similar to the § 1983 statute, the NJCRA allows a party who has been deprived of any rights under either the Federal or State Constitutions by a person acting under color of law to bring a civil action for damages and injunctive relief. The NJCRA was modeled after 42 U.S.C. § 1983 and "[c]ourts have repeatedly construed the NJCRA in terms nearly identical to its federal counterpart: Section 1983." Chapman v. New Jersey, No. 08-4130, 2009 WL 2634888, at *3 (D.N.J. Aug. 25, 2009). Courts in this district have previously recognized that "the New Jersey Civil Rights Act is interpreted analogously to 42 U.S.C. § 1983." Martin v. Unknown U.S. Marshals, 965 F. Supp. 2d 502, 548 (D.N.J. 2013) (citing Hottenstein v. City of Sea Isle City, No. 11–740, 2011 WL 3651302, at *4 (D.N.J. Aug. 18, 2011)); see also Petit v. New Jersey, No. 09-3735, 2011 WL 1325614, at *3 (D.N.J. Mar. 30, 2011) ("This district has repeatedly interpreted NJCRA analogously to § 1983.).

Because Plaintiff's malicious prosecution claim under § 1983 fails, and Plaintiff has not presented any new theory of liability under the NJCRA, the Court will dismiss Plaintiff's

48

malicious prosecution claim under the NJCRA for reasons already stated above. See Pitman v. Ottehberg, No. 10-2538, 2013 WL 6909905, at *8 (D.N.J. Dec. 31, 2013) (noting that claims under the NJCRA are analogous to claims under § 1983 and dismissing malicious prosecution claim under the NJCRA because plaintiff failed to identify a specific theory of liability grounded in the NJCRA or New Jersey Constitution that is different from his claims under § 1983); Monroe v. City of Hoboken, No. 11-2556, 2012 WL 119177, at *11 (D.N.J. Apr. 10, 2012) (noting that "the Court's analysis on the § 1983 claims applies to plaintiff's claims under the NJCRA" and dismissing plaintiff's malicious prosecution claim).

## IV. CONCLUSION

For the foregoing reasons, the Court will grant Defendants' motion for summary judgment. The accompanying Order will be entered.

**September 30, 2015**
Date

    **s/ Jerome B. Simandle**
JEROME B. SIMANDLE
Chief U.S. District Judge